1
                     UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2                         TAMPA DIVISION

3     UNITED STATES OF AMERICA

4

5              vs.                CASE NO. 8:07-cr-438-T-23MAP
                                  July 10, 2008
6                                 Tampa, Florida
                                  8:46 a.m.
7
      WILLIAM GARY SULLIVAN,
8
                    Defendant.
9
      _____/
10
                TRANSCRIPT OF EXCERPT OF PROCEEDINGS
11                     SENTENCING HEARING
                    (Excluding sealed portions)
12         BEFORE THE HONORABLE STEVEN D. MERRYDAY
                  UNITED STATES DISTRICT JUDGE
13
      APPEARANCES:
14
      For the Plaintiff:  Thomas Nelson Palermo
15                        Assistant U.S. Attorney
                          400 N.Tampa Street
16                        Suite 3200
                          Tampa, Florida 33602
17                        813/274-6000

18    For the Defendant:  Jeffery Geldert Brown
                          Attorney at Law
19                        450 Carillon Parkway
                          Suite 120
20                        St. Petersburg, Florida 33716
                          727/299-0099
21

22    Court Reporter:     Kerry Mercade
                          801 N. Florida Avenue
23                        Suite 15A
                          Tampa, Florida 33602
24                        813/301-5024

25    Proceedings recorded and transcribed by
      computer-aided stenography.

1                    ADDITIONAL APPEARANCE

2
     For the Defendant:      Robert Curtis Murtha
3                            Attorney at Law
                             111 North Belcher Road
4                            Suite 202
                             Clearwater, Florida 33765
5                            727/726-5297

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Call to order of the Court at 8:46 a.m.)

2          THE COURT:  Good morning.  We are

3   together in Case 07-cr-438, United States of

4   America vs. William Gary Sullivan.

5          Who speaks for the United States?

6          MR. PALERMO:  Your Honor, Thomas Palermo

7   on behalf of the United States.  Good morning.

8          THE COURT:  Good morning, Mr. Palermo.

9          And who speaks for the defense?

10          MR. BROWN:  Jeff Brown on behalf of

11   William Sullivan, and Curtis Murtha is also here

12   as counsel of record.

13          THE COURT:  Good Morning, Mr. Brown and

14   Mr. Murtha.

15          You are William Gary Sullivan?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Mr. Sullivan, on November the

18   28th of last year, you pled guilty to two counts

19   of an information.  Count 1 charges you with

20   conspiracy, in particular, a conspiracy to commit

21   fraud in connection with computers in violation of

22   Section 371 of Title 18.

23          I believe Count 2 charges fraud in

24   connection with computers and in violation of

25   parts of Section 1030 of Title 18 of the United

1    States Code.

2              I earlier entered an order that accepts

3    your plea of guilty and that adjudges you guilty

4    of both Counts 1 and Count 2, so as of this

5    moment, your guilt of those two Counts is

6    determined by your plea and my acceptance of your

7    plea and it remains to determine your sentence,

8    which I shall accomplish by first calculating an

9    advisory sentence in accord with the United States

10   Sentencing Guidelines, and then inviting both the

11   United States and the defense to direct to my

12   attention any matter under 18 U.S.C. § 3553(a) or

13   in fact any other matter that I should consider in

14   arriving at a final and reasonable sentence in

15   accord with applicable law.

16             I will begin by asking Mr. Palermo if he

17   has had an opportunity on behalf of the United

18   States to review and evaluate the presentence

19   report.  If so, whether there is an objection

20   either to the factual accuracy of the report or to

21   the application of the Sentencing Guidelines that

22   is proposed by the United States Probation Office?

23             MR. PALERMO:  Your Honor, I have reviewed

24   the presentence report and I have no objection to

25   either the facts or the law.

1            THE COURT:  Mr. Brown, have you and Mr.

2     Sullivan similarly had an opportunity together to

3     review and evaluate the presentence report?

4            MR. BROWN:  Yes, Your Honor.

5            THE COURT:  First, is there any objection

6     to the facts statement contained in the

7     presentence report?

8            MR. BROWN:  Judge, when I went over this

9     last night, I noticed that while my objection to

10    Paragraph 32 -- excuse me, 33 and 36.  There are

11    some facts that I would argue in Paragraph, I

12    think it is 11, could be changed.

13            But I think it is more appropriate first

14    to handle my objections, I guess, to Paragraphs 33

15    and 36.

16            THE COURT:  To the guideline calculation.

17            MR. BROWN:  Yes, and then maybe we can

18    change facts, if I win those objections.

19            THE COURT:  Okay.  So we will defer a

20    moment on the question of the facts, although to a

21    certain extent it is necessary to fix the facts

22    before we determine extrapolations from those

23    facts, such as those in the guideline calculation.

24            I will give you a chance on it, Mr.

25    Brown, to do it your way.  You are recognized to

1    advance any objections you have to the proposed

2    guideline calculation.

3          MR. BROWN:  Thank you, Your Honor.  Your

4    Honor, if I could draw the Court's attention first

5    to Paragraph 33.

6          THE COURT:  Yes, sir.

7          MR. BROWN:  Paragraph 33 was a two-level

8    increase under 2(b)1.1, Paragraph 3, Paragraph 9,

9    Paragraph C --

10         THE COURT:  Right.

11         MR.  BROWN: -- indicating that in

12   Probation's opinion this offense involved

13   sophisticated means.

14         THE COURT:  Right.

15         MR. BROWN:  As evidence therefor, they

16   set out in that paragraph that the sophisticated

17   means was the creation of a corporation which it

18   said to facilitate and conceal the commission of

19   the offense.  I am objecting to that application.

20   What they are talking about is a corporation that

21   was formed at the same time as the fraud began

22   called S & S Corporation.

23         However, S & S Corporation wasn't done

24   to facilitate the comission of the crime.  S & S

25   Corporation was a corporation duly registered in

1    the State of Florida, in which Mr. Sullivan

2    indicated with the state of Florida as a public

3    record he was the President, the Vice-President,

4    the registered agent.  The address for S & S

5    Corporation wasn't some fictitious address or some

6    P.O. Box; it was his home address.  S & S

7    corporation was simply the vehicle wherein he

8    received these checks from Mr. Curry (ph), an

9    unindicted, what I believe, co-defendant or

10   co-conspirator.  He took these checks, deposited

11   them into the account for S & S, and then paid

12   taxes on those on his tax returns.  There is

13   nothing nefarious about this; it was completely

14   open and obvious.  Anybody that wanted to check to

15   see who owned S & S, would find that it's his name

16   and it's his address.

17          The checking account had all the checks

18   in it.  It was completely easy for anybody to find

19   it.  There was nothing done with S & S that

20   facilitated the commission of the crime.  The

21   crime occurred by taking the names off of the

22   database and then turning those names over to Mr.

23   Curry, however -- whether or not -- the fact that

24   he got paid by Mr. Curry, that just simply was the

25   fruits of the crime, so to speak, but S & S

1   Corporation had nothing to do with the

2   facilitation of that, and it certainly didn't

3   conceal anything.  Anybody that wanted to find out

4   who the corporation was, was a direct link to Mr.

5   Sullivan.  So I don't believe that it either

6   facilitated or concealed the commission of the

7   offense, so I don't believe that's appropriate.

8           I looked for case law on this because --

9   and I am sure the Court has gone to the commentary

10  and the application notes.  In the sophisticated

11  means enhancement, under the application notes is

12  for purposes of Subsection 9, excuse me,

13  (b)(9)(C), "sophisticated means" means especially

14  complex or especially intricate offense conduct

15  pertaining to the execution or concealment of the

16  offense.  I think what the guidelines are trying

17  to accomplish here is not to apply this to every

18  type of case, but only to a small percentage of

19  cases that actually are especially complex or

20  especially intricate.

21          It talks about, for example, in a

22  telemarketing scheme, locating the main office of

23  the scheme in one jurisdiction, but locating

24  soliciting operations in another jurisdiction.

25  And it talks about hiding assets or transactions

```
1    through both the use of fictitious entities,

2    corporate shells, or offshore financial accounts,

3    which also ordinarily indicates sophisticated

4    means, none of which we have here.

5              THE COURT:  This is not a corporate

6    shell?

7              MR. BROWN:  No, I don't believe it's a

8    corporate shell.  What they're indicating here,

9    which would be something where you would not --

10             THE COURT:  This corporation had other

11   assets?

12             MR. BROWN:  It had other money that came

13   into it.  It was not solely the money that came

14   from Mike Curry.  It did have a small percentage

15   of money that he was able to put in there.  But by

16   and large, yes, 99 percent of it did come from

17   there, but it wasn't done -- there's no reason --

18   this S & S Corporation didn't conceal anything,

19   and it certainly didn't facilitate it.

20             If someone wanted to find out, like the

21   government did, where the money came from, it was

22   pretty easy to do -- where the money went to.

23   It's all in checks.  They're all in the checking

24   account.  Mr. Sullivan's name is on the checking

25   account.  There's nothing fictitious about this.
```

1    It was simply a vehicle created by him because he

2    wanted to be able to obviously pay taxes, but

3    thought that he could also, since he was making

4    this money, deduct some expenses.  And by forming

5    a corporation, you have much more leverage and

6    much more of an ability to deduct some expenses

7    than, such not, you do if you just sent the checks

8    to himself.  But as far as concealing anything,

9    there was nothing to conceal, and it certainly

10   didn't facilitate it.

11          The case law that I found, while all

12   helpful to me, in the Eleventh Circuit were all

13   unpublished opinions.  However, I did find a case

14   out of the Seventh Circuit:  United States of

15   America vs. Patrick Allen (ph), decided in January

16   of this year, involving a defendant that committed

17   a fraud on Hewlett-Packard.  He did so by

18   pretending to be a referral partner.  He basically

19   went out and found -- Hewlett-Packard had a

20   provision in which it paid people who referred

21   business to them.  Well, he went out through an

22   inside employee and found a lot of companies that

23   had been buying HP computers that didn't have a

24   referral partner, and he then created false

25   documents to pretend he was that referral partner,

1    to receive over $500,000.

2              It talked about the enhancement there

3    where the Court affirmed that was a sophisticated

4    means.  And it talks about that he evaded

5    discovery for over a year by doctoring fax

6    headers, fashioning phony e-mail addresses to

7    resemble legitimate contact information.

8    Moreover, after HP detected the fraud and removed

9    him from its list of referral partners, he

10   perpetrated a similar scheme with another company

11   for another month.

12             And then it talked about some other

13   cases that it found to be sophisticated, talking

14   about finding sophistication where a defendant

15   fooled a skilled neurologist and 14 insurers.  And

16   tax fraud cases where a defendant falsified tax

17   forms and used false Social Security numbers.  And

18   another case where the defendant falsified

19   business records using false names and providing

20   misleading tax information.

21             And it seems that that's what most of

22   the cases all talk about is this creating of

23   fictitious invoices, double billing, changing the

24   original shipping destinations and maximizing pay.

25   All seem to be examples of what they're talking

1   about for this sophistication to apply.

2          My argument would be that doesn't apply

3   to what we have here.  I know he created an S & S

4   Corporation, but I think the enhancement is to

5   apply to something that's much more sophisticated

6   or intricate as the guidelines talk about, or

7   especially complex than what we have here.  Had he

8   changed -- had he had a fictitious name, had he

9   used a P.O. Box or a different address, or done

10  something that would indicate or make it hard for

11  someone who found about S & S to find out who

12  really does own S & S -- are they off shore?  Are

13  they located in a different jurisdiction?  All of

14  that might lead to sophisticated means, but

15  there's none of that here.  It's not a fictitious

16  name.  He is not making up a name.  He's not

17  making up an address.  He is not using a P.O. box.

18  He is not creating -- putting this in a different

19  jurisdiction.  He's not doing anything that would

20  lead the Government -- I think the government

21  would concede, it was extremely easy to find out

22  how he got paid, because there was S & S

23  Corporation.  It's a public record.  It's listed

24  in his name with his on address on it.

25          So I would argue that while I understand

```
 1    that the guideline does say "Corporate Shells", I
 2    don't believe that that's -- in looking at the
 3    rest of the guideline, that's what they're talking
 4    about, simply creating a corporation.  Maybe if
 5    you created that corporation with a fictitious
 6    name or a different address or a false address, or
 7    as some of these -- the case that I cited, as some
 8    of the individuals did creating fake faxes or
 9    changing the headers on certain information.  But
10    as far as this application, I would argue that it
11    did not facilitate or conceal the commission of
12    the offense.
13              THE COURT:  How long did the offense go
14    undetected from start to --
15              MR. BROWN:  2002 to 2007, five years.  I
16    can get into --
17              THE COURT:  Something worked.
18              MR. BROWN:  Well, that kind of ties into
19    my other objection for abuse of position of trust.
20    So if you want to reserve on that, I can --
21              THE COURT:  I think they are connected.
22              MR. BROWN:  To some extent, yes.  I have
23    an argument as to that as well.
24              THE COURT:  I trusted that you did.  Let
25    me see what Mr. Palermo's response is on behalf of
```

1    the United States on the question of sophisticated

2    means.

3              MR. PALERMO:  Your Honor, the defendant

4    was able to successfully conceal the activities

5    for approximately five years.  And part of the

6    successful concealment, I would pause it that --

7    the name of the company was S & S Computer

8    Services.  It was certainly disguised even by it's

9    formation, what was going on in these series of

10   transactions between the individuals.

11             The application notes, as Mr. Brown did

12   indicate, state conduct such as hiding assets or

13   transactions or both through the use of fictitious

14   entities, corporate shells, or offshore financial

15   accounts also would merely indicate sophisticated

16   means.  In this case, I would pause it to the

17   Court that S & S Computer Services essentially did

18   nothing other than this.

19             Now, there are three transactions that I

20   am aware of from their bank account in 2002:

21   February 27th, 2002; March 4th, 2002; and March

22   16th, 2002.

23             THE COURT:  I'm sorry, say that again.

24   What happened on those three dates?

25             MR. PALERMO:  Three transactions that

```
 1    were --

 2              THE COURT:  I see.

 3              MR. PALERMO: -- as far as I can tell

 4    that are unrelated to this.  Otherwise, the

 5    balance of the six hundred plus thousand dollars

 6    involved in this offense and the money flowing

 7    into S & S Computer Services in payment for the

 8    stolen data, that is what S & S Computer Services

 9    served to do.  There was no legitimate function.

10    This is as far as I can tell a shell.  I would

11    just limit my arguments to that.  I think the

12    Court has already noted the success.  I leave it

13    at that, Your Honor.

14              THE COURT:  I don't see anywhere in the

15    commentary, or in the cases, or in two or three of

16    the treatises that are out there any reference to

17    the corporate alter ego concept, but it seems

18    useful here.  If you were going to --

19              You furrow your brow, Mr. Brown.  It is

20    obvious as the nose on your face that disregarding

21    the corporate-ness of some entity would suggest

22    that it was a shell.  So if someone were to look

23    at this entity on the threshold question of is it

24    a shell, for instance, if it had incurred a

25    liability and had no assets with which to satisfy
```

1    that liability, I suspect that any court would

2    have in the twinkling of an eye disregarded it and

3    looked to the assets of the defendant.  It has no

4    employees.  It has no corporate policy.  It has no

5    corporate purpose that is ascertainable, distinct

6    from this transaction.  It has no independent

7    board.  It has no -- it has nothing.  It merely

8    has the irreducible residual of corporate

9    attributes until challenged is about what it had.

10   I am satisfied it was a corporate shell.  It is

11   almost defiantly a corporate shell.

12          The question is:  Does it otherwise have

13   any materiality in the question of whether the

14   means that were employed in the offense were

15   sophisticated?

16          And it's not clear to me whether the

17   fact that this was not discovered for some time is

18   more than tangentially related to the use of this

19   shell, Mr. Palermo.  It looks like it may be a

20   combination of factors that contributed to the

21   extensive duration of this episode.  I am not sure

22   that the shellness of this corporation contributed

23   much to it.  It almost looks --

24          Well, let me just ask you to respond to

25   this:  It looks like this fellow was so confident

1    he would not be detected otherwise that he created

2    -- this stood no chance of slowing anyone down

3    from finding him for even a second, even though it

4    was a corporate shell.  So he was relying on other

5    things and -- was he not?

6         MR. PALERMO:  He was in fact relying on

7    other things in addition to the corporate shell.

8    I have focused in on that particular portion of

9    sophisticated means in part because that's the

10   reason promulgated by U.S. Probation.  I do think

11   that is probably a valid reason since it's one

12   aspect of what is otherwise the course of conduct

13   that led to why we're here today.  That Mr.

14   Sullivan registered the corporation in his name, I

15   am not sure necessarily makes it less

16   sophisticated in its technique than it could

17   otherwise have been.  Just because he wasn't

18   Einstein in doing it doesn't mean that it's not

19   more sophisticated than an ordinary individual

20   coming in and committing a similar offense.

21        THE COURT:  Well, that is the test, isn't

22   it?

23        MR. PALERMO:  Yes.

24        THE COURT:  The word sophisticated means

25   is in parenthesis, although you can't see it, as

1    compared to the unspecified, typical instance of

2    the same offense.

3            MR. PALERMO:  That would be my position,

4    that by using this it is different.  It is more

5    sophisticated than the average or than the normal

6    --

7            THE COURT:  Than the normal interceptor

8    of private --

9            MR. PALERMO:  A rather narrow group of

10    individuals.  I have no good case law.  To be

11    candid with the Court, I found nothing

12    specifically on this type of conduct that would

13    give me a clear definition of how this was more

14    sophisticated among defendants who are similarly

15    situated for committing the same types of

16    offenses.

17            But if the data itself was treated as

18    nothing more than any other corporate property

19    that was stolen, then this would be more

20    sophisticated than someone who just simply wire

21    transferred it to his own accounts.  He used a

22    shell, a fence, if you will, that was created.  He

23    used a fence that was created by himself to

24    facilitate the exchange of the object for the

25    money, whatever that object was.

1          THE COURT:   There is no other

2    paraphernalia in this episode, is there?   There is

3    just the shellness of this corporation.   He was

4    using it as a device to accumulate cash, or

5    proceeds is a better word, I think.

6          MR. PALERMO:   Yes, it was the vehicle

7    through which he was able to convert the stolen

8    goods into something of value, that is, money.

9    Not that the goods themselves weren't of value,

10   but they're functionally not valuable to him other

11   than what he can parlay them for, cash.

12         THE COURT:   Now, let me ask you this.

13   Would this have been a sophisticated means scheme

14   without the shell corporation if he had done it,

15   say, using his brother-in-law?   I don't know that

16   he has a brother-in-law, some agreed person, some

17   stipulated person.

18         MR. PALERMO:   Probably not.   I'm not sure

19   that the extra step -- it would have just simply

20   been a different conspiracy rather than what it is

21   today.

22         THE COURT:   I think I agree with that,

23   Mr. Palermo.   I think that you lose when you agree

24   to that on this set of facts.   I know that the

25   commentary says "corporate shell" and this is a

```
 1    corporate shell, I agree.  But it says that -- it
 2    indicates a sophisticated means.  Of course, the
 3    word "indicate" means is a sign of.  It does not
 4    mean equals invariably.  And I think it would need
 5    to say -- it would need to mean equals invariably
 6    in order for this device - not very effective, not
 7    very convincing, not very thought out, perhaps
 8    even mildly amateurish - to qualify as
 9    sophisticated means.
10            It was a means, but I'm not sure it was
11    sophisticated, and I think that any, if there is
12    such a thing, typical perpetrator is going to have
13    some equivalent.  It's not going to do it in and
14    out of his own wallet directly.  In and out of his
15    own -- it is a close question and I will resolve
16    the doubt in favor of the defense.  Sustained.
17            You better move along, Mr. Brown, before
18    I change my mind.  That corporate shell is a
19    pretty, pretty square hit.
20            MR. BROWN:  We're moving on, Judge.  I
21    can't move any faster than I'm going to do right
22    now.
23            Judge, if we can go to Paragraph 36, and
24    I'll need to approach at side bar, if I can.
25            THE COURT:  With counsel for the United
```

1    States?  All right.  It's easier if you come

2    around or just walk in front so she can get in the

3    middle.  I take it you want an off-the-record side

4    bar?

5              MR. BROWN:  No, it's on the record.

6              THE COURT:  Okay.

7              (Sealed side bar discussion excluded from

8    transcript.)

9              THE COURT:  The defendant has objected

10   to the enhancement in Paragraph 36 of the

11   presentence report with respect to a breach of

12   trust, and I have overruled the objection, and the

13   enhancement for breach of trust will remain.

14             The side bar conference contained

15   material both pertinent to the question of breach

16   of trust and of a subject matter typically subject

17   to a seal in criminal cases, so I will seal the

18   side bar pending further order of the Court.

19             Mr. Brown, had you any other objections

20   to the application of the Sentencing Guidelines?

21             MR. BROWN:  No, Your Honor.

22             THE COURT:  All right.  In that case, if

23   I understand it correctly, you also now have no

24   outstanding objection to the statement of facts.

25             MR. BROWN:  No, Your Honor.

 1            THE COURT:  In that case the Court adopts

 2    the facts statement contained in the presentence

 3    report and the Offense Level of 25, Criminal

 4    History Category I, which is the two levels -- two

 5    offense levels less than that recommended by the

 6    probation office.  The advisory guideline range is

 7    57 to 71.

 8            Mr. Palermo, I noted no motion under 5K1

 9    or otherwise on behalf of this defendant by the

10    United States, is that right?

11            MR. PALERMO:  That is correct, Your

12    Honor.

13            THE COURT:  All right.  Mr. Brown, you

14    are recognized to offer any matter in mitigation

15    or any matter under 18 U.S.C. § 3553(a) that I

16    should consider in formulating a final and

17    reasonable sentence, after which I will recognize

18    Mr. Sullivan in allocution.

19            MR. BROWN:  Can we approach again, Judge?

20            MR. PALERMO:  Your Honor, I just need a

21    moment.  We may have gotten the guideline

22    calculation wrong.  I just need a moment with Ms.

23    Stafford, Your Honor.  I apologize.  I believe

24    there was an additional enhancement that was

25    stricken from a later iteration of the PSR, but I

```
 1    am not sure about that and I would rather get it

 2    right if I could have one moment.

 3               (Pause.)

 4               THE COURT:  It becomes ambiguous whether

 5    you are speaking to one another or on the record,

 6    so if you want to talk to Ms. Stafford, why don't

 7    the two of you step over there and talk to her

 8    clearly off the record and we'll get this

 9    resolved.

10               (Pause.)

11               MR. PALERMO:  Your Honor, I have a letter

12    from Probation Officer Glover from March 12, 2008

13    indicating that she was eliminating the

14    enhancement under 2B1.1(b)(14)(A).  I think --

15               THE PROBATION OFFICER:  That I was

16    unaware of.

17               MR. PALERMO:  I believe that present

18    before the Court is Officer Stafford rather than

19    Officer Glover.

20               THE COURT:  Well, I can verify that.

21               MR. PALERMO:  I believe, Your Honor, that

22    it is 23 and not 25.

23               THE COURT:  Well, it's not clear to me

24    why that Paragraph 34 is not correct.  This was a

25    Section 1030 offense --
```

```
1                MR. PALERMO:  It was.

2                THE COURT:  -- and evidences an intent to

3    obtain personal information.  Is there some reason

4    that those two points are not applicable?

5                MR. PALERMO:  I am double checking now,

6    Your Honor.  I got the letter from Officer Glover.

7    I believe I had a discussion with Officer Glover,

8    but I want to make sure that --

9                (Pause.)

10               MR. PALERMO:  I apologize.  It was my

11   understanding from Beth's March 12th letter, by

12   Officer Glover's March 12th letter, when she

13   reviewed the application of 1030 -- well,

14   application -- the Subsection (14)(a)(2), which

15   refers back to 18 U.S.C. § 1030(a)(5)(A)(1).

16                    1030(a)(5)(A)(1) --

17               THE COURT:  That wasn't applied, was it?

18   There is no four-level enhancement in here under

19   the --

20               MR. PALERMO:  No.  I am trying to find

21   the note that I had from Beth.  I am sorry, Your

22   Honor.

23               THE COURT:  Each of those applies

24   sequentially unless a greater one applies so that

25   you are not doubling them.  So actually the least
```

1    one of them applied, and none of the greater ones

2    applied.  So I think that that is correct, the two

3    points.  Although, I would hesitate to argue with

4    Ms. Glover, if she has made a determination to the

5    contrary.

6             MR. PALERMO:  I am sorry, Your Honor.  It

7    is correct that it should apply.  I do apologize.

8    I just wanted to make sure that was right because

9    I saw the letter from --

10            THE COURT:  What did you just learn that

11   changed your mind?

12            MR. PALERMO:  I re-visited the actual

13   text of the sentencing guidelines rather than the

14   letter that I received from Officer Glover.  I

15   think her assessment in the PSR is correct, and

16   that the letter is --

17            THE COURT:  We have a letter from Ms.

18   Glover which is demonstratively incorrect?

19            MR. BROWN:  I have several in my files.

20            THE COURT:  Okay.  It looks right to me.

21            MR. PALERMO:  I think it is, Your Honor.

22   I just had a letter separately from Officer Glover

23   that I thought --

24            THE COURT:  Okay.  It looks right and Mr.

25   Brown is not objecting to it, although I'm sure he

1     will agree to object to it.

2              MR. BROWN:  I am standing mute.  I kind

3     of like where we're headed.

4              MR. PALERMO:  I apologize.

5              THE COURT:  All right.  Then I persist in

6     my determination that the Offense Level applicable

7     is 25, the Criminal History Category is I, the

8     applicable advisory guideline range is 57 to 71.

9              Mr. Brown is recognized to offer any

10    matter in mitigation or any matter under 3553.  He

11    has requested to come to side bar again, I assume

12    to offer matters in mitigation.  It's not

13    typically a subject taken up at side bar, but

14    sometimes, and we will take it up, at least

15    preliminarily at side bar until I can determine

16    whether it requires a seal.

17             So Mr. Brown and Mr. Palermo, you can

18    come to side bar and we'll hear what you have to

19    say.

20             (Sealed side bar discussion excluded from

21    transcript.)

22             THE COURT:  Mr. Brown, anything further?

23             MR. BROWN:  Your Honor, just in

24    summation, Mr. Sullivan is 54-years-old.  I can't

25    say he's had no prior involvement with the law

1    because he did have a DUI that was reduced to

2    reckless driving and I believe a petty theft.  But

3    for 54 years, he has managed to avoid anything

4    else.  He has just -- he and his wife, they have

5    lost their jobs.  This was his job.

6              Besides some of the factors that I have

7    announced at side bar, I would be asking this

8    Court to impose a reasonable sentence.  I would

9    ask that the Court impose a sentence under 36

10   months.  At this point, Mr. Sullivan is ready for

11   allocution.

12             THE COURT:  Mr. Sullivan, you do have an

13   opportunity to speak this morning with respect to

14   your prospective sentence and these offenses.  You

15   are not required to say anything of course, but if

16   you would like to say something, now would be the

17   proper time.

18             THE DEFENDANT:  Yes, Your Honor, I would.

19   I deeply regret what I did.  I in no way intended

20   to cause anybody any grief or hardship.  I had no

21   idea that Certegy would end up spending the amount

22   of money they did.  I was 47-, 48-years-old, no

23   401(k), no savings.  My wife wasn't working.  Mike

24   Courier (ph) approached me with this idea.

25             MR. BROWN:  I'm not so sure we should

1  talk about that.

2          THE DEFENDANT:  The bottom line is that

3  it was -- at that particular time, it was easy to

4  do, and I made a bad mistake.  I am not saying

5  that just because I got caught.  Every week that

6  it happened I regretted it, that I had to resort

7  to that.  But it didn't stop me from doing it.

8          I tried my best to cooperate and tell

9  everybody everything I know.  I got -- there is

10  just so many things that I have gone through, and

11  I know other people have, too.

12          Now taking care of my mentally

13  handicapped sister is going to fall on my back.

14  My mom is 82.  She's getting to the point where

15  she can't care for her anymore.

16          I don't have a clue what I'm going to do

17  as a livelihood.  I seriously doubt anybody is

18  going to hire me for what I've worked 40 plus

19  years to do.

20          I am going to stand up, be a man, take

21  my punishment, and try to move on.  That's it.

22          THE COURT:  Thank you, Mr. Sullivan.

23          Mr. Palermo, what says the United States

24  with respect to matters under 18 U.S.C. § 3553 and

25  a reasonable sentence under the circumstances?

1          MR. PALERMO:  Your Honor, this particular

2     offense does contain within it some interesting or

3     at least novel aspects.  I think the first place I

4     would like to start in describing the nature of

5     the offense and the seriousness of it is to begin

6     with a sentencing by the number, so to speak.

7          The defendant was employed by Certegy

8     for approximately nine years, and of those nine

9     years for at least five of them, from 2002 to

10    2007, he was involved in stealing from Certegy the

11    data of consumers.

12          There were seven class action lawsuits

13    filed against Certegy.  Six remain.  They are in

14    various stages of settlement.  The printing and

15    mail required to notify the individuals whose

16    identity information was stolen was $3.2 million.

17    Part of the reason why it was so high was because

18    there were over 5.9 million people that Certegy

19    was required to notify.  I would pause it that, in

20    fact, the number of people's information involved

21    was actually higher than that, because the

22    individuals whose data was taken that was just

23    simply publicly available information residing in

24    the database, they may not have had to have been

25    notified at least by the means that Certegy has

```
 1    used.  That is 8,413,806 individuals.  That's the
 2    people in all 50 states, the Virgin Islands, the
 3    District of Columbia, Puerto Rico, the Armed
 4    Forces, the P.O. boxes around the world where our
 5    service members are stationed.  And it is also
 6    international, although it's not a lot.  It's 142
 7    individuals who were not in the United States
 8    whose data was stolen.  From the State of Florida
 9    alone, it was 277,603 individuals whose bank
10    account information was given; 115,137 consumers
11    with credit and debt account information; 68,394
12    consumer records with no financial information
13    attached.  There are over $233,000 paid in outside
14    counsel fees, $400,000 in legal fees for the class
15    action lawsuits, $2.35 billion to be paid for
16    plaintiffs' lawyers.  The numbers -- the numbers
17    are staggering.
18              For this, Mr. Sullivan made roughly --
19              THE COURT:  What was the counsel fees
20    figure?  You said $2.5 billion?
21              MR. PALERMO:  $2.35 million.  I'm sorry
22    if I made it sound like a B.  It's an M.
23              THE COURT:  I awarded part of that fee,
24    and I am sure it wasn't $2.35 billion.
25              MR. PALERMO:  No, no.  It's definitely
```

1    $2.35 million.  There's no B; definitely an M.  My

2    enunciation may be lacking this morning.

3              For this, Mr. Sullivan made over

4    $600,000.  He used the money to pay primarily his

5    day-to-day personal and recreational expenses.  He

6    used the money to live.

7              Mr. Sullivan started what I can only

8    describe as a fire storm for Certegy, but

9    certainly also for at least quite a few of the

10   millions of individuals who received notice, the

11   nearly six million who received notice that their

12   information was taken.

13             I note, for example, that we know that

14   information that was stolen from Certegy went to a

15   company called Suntasia (ph), also known as

16   Strategic Marketing (ph).  Suntasia is in

17   receivership through an action of the Federal

18   Trade Commission related to its practices.

19             The data was sold to telemarketers

20   ultimately, but there is no real control over

21   where this data went once it left the hands at

22   least of Mr. Sullivan.  Mr. Sullivan can only

23   control where he thought the data was going and

24   where he sent the data, but once it left his

25   hands -- electronic data is easily replicable.  It

1   goes into a database and appears over and over and
2   over again.
3          One needs only consider the child
4   pornography cases the Court sees on a routine
5   basis to know that those images -- that data in
6   electronic format once let lose upon the world
7   never quite goes away.  This has ongoing
8   repercussions.  It is a serious matter.
9          I always say that part of what happened
10  to an individual is based not only on what they
11  did in an offense, but what they did after.  And
12  once he was arrested he did cooperate, and I have
13  -- we have spoken on those matters.
14         Other than that, this offense is
15  serious.  It is serious not just because it
16  impacted Certegy, but it is serious because of all
17  the other lives that it touched on and will
18  continue to touch on for years.
19         For that reason, I would ask the Court
20  to impose a guideline sentence in this case.  I
21  have requested in the plea agreement that the
22  period of incarceration be substantial.  That was
23  my agreement with Mr. Brown in the plea agreement.
24  I did not recommend low end or bind myself to
25  recommend the low end.  I merely invite the Court

1    to consider the Sentencing Guidelines in this case

2    and to apply what the Court feels is an

3    appropriate sentence.

4            MR. BROWN:  Can I have one minute to

5    speak to counsel?

6            THE COURT:  You may.

7            (Pause.)

8            MR. PALERMO:  Your Honor, may I have one

9    more moment with counsel for the defense?

10           THE COURT:  Sure.

11           (Pause.)

12           THE COURT:  Anything further, Mr. Brown?

13           MR. BROWN:  No, Your Honor.

14           MR. PALERMO:  Your Honor, I'm sorry.  The

15   only other thing I would note, if I may -- I'm

16   sorry, Your Honor.

17           THE COURT:  Yes, sir.

18           MR. PALERMO:  I think the Court is in the

19   best position to determine what a reasonable

20   sentence is here.  In this particular matter, the

21   -- and it is certainly the position of the United

22   States Attorney's Office that a guideline sentence

23   is reasonable.

24           THE COURT:  Always.

25           MR. PALERMO:  Always.  So I -- this

1    particular case, as I said, has unique

2    characteristics, and I invite the Court to

3    consider the matter if the Court sees fit.  That's

4    it, Your Honor.

5            THE COURT:  Am I correct that as a result

6    of the diversion of the personal information that

7    is the subject matter of this case, that although

8    Certegy certainly has incurred costs both assessed

9    against its treasury and assessed against its good

10   will, and although persons were subjected

11   presumably to unwanted solicitation and perhaps to

12   costs associated with their acceptance of that

13   solicitation in some instances, some unstated

14   number of them so far as I know, that this is not

15   an instance where credit information was diverted

16   to third parties who used that information to

17   incur debt visited upon the innocent persons whose

18   information was stolen?

19           MR. PALERMO:  That is correct, Your

20   Honor.

21           THE COURT:  It was a potential for that.

22           MR. PALERMO:  That is correct.

23           THE COURT:  And there remains today a

24   potential for that, if I understand correctly, the

25   gross information in front of me.

1          MR. PALERMO:  That is correct.  There is

2    no information that it was used in the traditional

3    identity theft sense.

4          THE COURT:  The other sort of -- so that

5    you will understand the inferences that I am

6    making here and have a chance to accost them, I

7    infer, although not absolutely, that the passage

8    of time is so great here that the potential for

9    that sort of episode, that is, the incurring of

10   debt by third parties and that debt is visited on

11   innocent victims is, while not largely -- while

12   not wholly gone, is largely gone.  Experience

13   would teach that it's probably now not going to

14   happen --

15         MR. PALERMO:  That is correct.

16         THE COURT: -- on any large skill.

17         MR. PALERMO:  I believe the risk is

18   diminished by the passage of time and certainly by

19   the actions taken after everything was uncovered

20   to secure the information.

21         THE COURT:  All right.  Well, then in

22   sentencing the defendant, I am not sure what the

23   effect of it is, but I am not assuming that I

24   should give any material weight to any prospective

25   instances of credit theft and utilization.

1              Any reason not to proceed to sentence?

2              MR. PALERMO:  No, Your Honor.

3              THE COURT:  Mr. Brown?

4              MR. BROWN:  No, Your Honor.

5              THE COURT:  Mr. Sullivan, you have

6    created quite a stir.

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Over a long period of time,

9    you've caused a lot of people a lot of trouble.  I

10   guess the good part of this episode is the one

11   that I just mentioned, that there were -- this

12   appears to have been confined by relatively prompt

13   action and good fortune to simply harassment by

14   telemarketers.  That is the good news for you.

15   The bad news is that it still caused a huge mess.

16   It serves to visit anxiety and disruption on an

17   almost unimaginable number of people.

18              You know, as stories of this sort go

19   through our information media, people hear about

20   it and feel less secure in their day-to-day lives,

21   less confident making transactions in the

22   marketplace.

23              I suppose that most major reservoirs or

24   those in charge of the major reservoirs of this

25   kind of information are now more -- are better

1    informed and better able to prevent those who

2    would act as you acted from committing their

3    crimes.  But nonetheless, this sort of activity

4    plays a major part in the day-to-day life of our

5    country and other countries and brings on a great

6    deal of misery.  And this kind of activity simply

7    must be quashed or it stands to create, again,

8    almost an untold amount of disruption.

9           As I'm sure you know, and you didn't

10   intend it this way, but the fact that you didn't

11   have a 401(k), and the fact that your wife didn't

12   work, doesn't mitigate that a bit.  I don't want

13   to take a shot at anything that you said because

14   you meant it in a different manner, and I took it

15   in the manner that you meant it.  Don't be

16   concerned about that.

17          We don't have a lot of these offenses.

18   You probably took that from our discussion about

19   what a typical offense of this nature might be.

20   There is not yet, I think, sufficient backlog of

21   these cases to make an assessment of what is

22   statistically typical about them or what their

23   distinguishing attributes are, but nonetheless, I

24   view this as a crime that's not to be winked and

25   nodded at and not to be overlooked just because

1   its origins might be in the insecurities and

2   anxieties of corporate life and family life in

3   middle America, which are common to a huge number

4   of persons.

5          In any rate, I am certainly glad that

6   this offense was not worse, and its victims were

7   not more seriously penalized than they were.

8          Pursuant to the Sentencing Reform Act of

9   1984 to the extent that it remains applicable

10  after United States vs. Booker, and pursuant to 18

11  U.S.C. §§ 3551 and 53, William Gary Sullivan is

12  committed to the Bureau of Prisons for 57 months

13  as to Count 1, and 18 months as to Count 2, those

14  terms to run consecutively, excuse me,

15  concurrently -- consecutively.  No, that's not

16  right.  Yes, it is.

17         Upon release from imprisonment, the

18  defendant shall serve a three-year term of

19  supervised release.  And that is three years as to

20  Counts 1 and 2, those terms to run concurrently.

21         While on supervised release, the

22  defendant shall comply with the standard

23  conditions adopted by the Court in the Middle

24  District of Florida, including the following

25  special conditions:  First, he shall be prohibited

1    from incurring credit charges, opening lines of

2    credit and obligating himself for major purchases

3    without approval in advance by the probation

4    officer.

5            Two, he shall provide the probation

6    officer with requested financial information.

7            Third, he shall refrain from employment

8    that includes access to consumers' personal

9    information, including without limitation bank

10   accounts, credit card accounts, home addresses,

11   dates of birth, telephone numbers and the like.

12           As a qualifying felon, the defendant

13   shall cooperate in the collection of his DNA, as

14   directed by the probation officer.

15           I am pleased to waive the mandatory drug

16   testing requirements of the Violent Crime Control

17   Act.

18           Mr. Palermo, does the United States want

19   to be heard on the question of restitution?  The

20   probation office has requested -- has recommended

21   a $3,972,290 determination of restitution.  The

22   parties are in agreement with that figure?

23           MR. PALERMO:  To some degree, Your Honor.

24   I think the -- I know it wouldn't be my burden,

25   but I don't know how the defendant would pay that

1    figure.

2              THE COURT:  I am absolutely certain he

3    can't.  I hope that he can and I am sure he hopes

4    that he can, but of course he can't.  The only

5    chance he would ever have of that probably would

6    be if he were not a felon.  The defendant shall

7    pay restitution in the amount of $3,972,290 to

8    Certegy by directing a payment to Lynn Cravey, the

9    senior vice-president in St. Petersburg at the

10   address of the office on 100 Second Avenue South.

11             The probation office has recommended

12   that the --

13             Ms. Stafford, I'm not sure I understand

14   what your recommendation is here.  Will you

15   announce it for me?  Are you recommending that he

16   pay some fixed amount up front?

17             THE PROBATION OFFICER:  Yes, Your Honor,

18   that he pay $60,000 immediately, and then of

19   course pay while he is incarcerated if he has a

20   Unicor job.

21             THE COURT:  All right.  And he pay a

22   small amount monthly?  How much per month upon

23   release?

24             THE PROBATION OFFICER:  I believe that

25   has to be a typo, Your Honor.

1          THE COURT:  I think it has to be a typo.

2    If it is not a typo then there is hope that he can

3    pay the $3 million after all.  But I think not.  I

4    think this must mean $250 per month.

5          THE PROBATION OFFICER:  I think so, too,

6    Your Honor.

7          THE COURT:  I did not independently

8    evaluate his monthly ability to pay.

9          THE PROBATION OFFICER:  Yes.

10         THE COURT:  He can pay the $60,000 now?

11         MR. BROWN:  Well, his home is also where

12    his wife lives.  I think since the PSR was done

13    such a time ago, those numbers have changed.

14         THE COURT:  He would have to sell the

15    homestead.

16         THE PROBATION OFFICER:  Well, there's

17    also $77,000 in liquid assets in a checking

18    account.

19         MR. BROWN:  I don't show that.  At the

20    time he had $39,000.

21         THE COURT:  Mr. Brown, do you want to be

22    heard on the question of whether he should be

23    required to make a payment over and above and

24    preceding his monthly levy?

25         MR. BROWN:  I do, Your Honor.

1          THE PROBATION OFFICER:  Your Honor, may I

2    bring something to your attention?

3          THE COURT:  Yes.

4          THE PROBATION OFFICER:  I don't know if

5    you intended -- the way the sentence was written

6    in the sentencing statement, you actually imposed

7    a sentence of 78 months, which is technically

8    outside of the advisory guideline range.  The way

9    it was written in the sentencing statement --

10          THE COURT:  I thought it was 78.  Was it

11    71?

12          THE PROBATION OFFICER:  It was written

13    the way it was because there is a five-year

14    statutory maximum on each of Counts 1 and 2.  So

15    it was split to make up the 78 months; one was 60

16    and one was 18.

17          THE COURT:  And they are required to be

18    consecutive.

19          THE PROBATION OFFICER:  Yes, with the

20    original figures.  The range of 57 and 71, I'm not

21    sure exactly what range you were --

22          THE COURT:  I did mangle that.

23          MR. BROWN:  I was going to go back to

24    that.

25          THE COURT:  I see what the problem is.  I

1    see what the problem is.  Does it -- it would

2    split 40-17?

3              THE PROBATION OFFICER:  You could split

4    it --

5              THE COURT:  It splits either way as long

6    as it is consecutive with a five-year maximum.

7              THE PROBATION OFFICER:  Yes, if you are

8    talking close to the top, 71 months, you could do

9    60 and 11, or however you'd like to, so long as --

10   no more than 60 on either one of the counts.

11             THE COURT:  All right.  Mr. Brown, go

12   ahead.

13             MR. BROWN:  I am still at a loss.  The

14   sentence -- I thought you said consecutively.

15             THE COURT:  I clearly mangled it, but go

16   ahead.  What do you propose?

17             MR. BROWN:  Well, you are at 57 months,

18   am I right?

19             THE COURT:  Go ahead and tell me what you

20   proposed since you are not going to get 36.  Your

21   next preference is 57, right?

22             MR. BROWN:  Yes.

23             THE COURT:  And you don't care how it's

24   split?

25             MR. BROWN:  I don't care how it is split

1    as long as it is --

2           THE PROBATION OFFICER:  Well, if 57 was

3    the intended sentence, it doesn't have to be

4    split.

5           MR. BROWN:  That's under 60, so --

6           THE COURT:  It goes up to 60.

7           THE PROBATION OFFICER:  Yes, Your Honor,

8    so it can be 57 and they can run concurrent.  But

9    if you go over 60, then you have to split it.

10          THE COURT:  I understand that.  I just

11    had not spotted that 18 sitting there.  Let me

12    just double check.

13          (Pause.)

14          THE COURT:  I am content to restate the

15    sentence as 57 months as to Count 1 and 57 months

16    as to Count 2 to run concurrently.  We'll do it

17    that way.

18          I levy the special assessment of $200,

19    which is due immediately.  I will waive the

20    imposition of a fine, particularly in light of the

21    large restitution that is due.

22          I have considered the factors arrayed at

23    18 U.S.C. § 3553(a) as well as the advisory

24    guideline range that is derived from the policies

25    and guidelines of the United States Sentencing

1    Commission.

2            This offense is committed by a Category

3    I offender, not precisely a first offender but

4    treated by me on this occasion as a first

5    offender, regarded by me as a first offender.

6            This offense is troubling and he is

7    fortunate that it was not egregiously worse than

8    it in fact was, which was bad enough.  It strikes

9    me as an offense particularly sensitive to and

10   requiring general deterrence.  This present state

11   of circumstances offers both great temptation and

12   great opportunity to commit this and similar

13   offenses, probably motivated by matters similar to

14   those that apparently motivated this defendant to

15   depart from his otherwise law-abiding life.  The

16   consequences of these offenses are such that a

17   grim penalty is due.  The consequences that reach

18   out from this penalty clearly require protection

19   for the public.  A great deal of damage can be

20   done in a great hurry and almost irrefutably so.

21   Unfortunately, not everyone insures themselves

22   against the consequence of crimes of this nature,

23   although I am sure that will become probably in

24   due course as typical as automobile or home

25   insurance.  For the moment, it is still possible

1    to visit devastating economic consequences on

2    large numbers of persons in a very short period of

3    time out of greed and self-interest.

4         I must say, without the assistance of

5    the guidelines it would be quite a task indeed to

6    come up with some absolute measure of the nature

7    of this offense.  Looking at that which the

8    commission has developed and considering this

9    defendant and the consequences of his offense, it

10   seems to me that the guideline range is right well

11   calculated, and I give him the benefit of the low

12   end of it on second thought owing to the good

13   fortune that the credit crimes did not occur to

14   the maximum intent and that the consequences to

15   Certegy, which were undeserved and aggravated, do

16   not reach the proportions that the other

17   consequences of this crime could have.

18        Does counsel for the United States or

19   the defense have any objection to the sentence or

20   the manner in which it was announced other than

21   those already stated?

22        MR. PALERMO:  No, Your Honor.

23        MR. BROWN:  No, Your Honor.

24        THE COURT:  Ms. Stafford, you look

25   troubled.  Have I done something else?  Have I

1    mangled something else?

2            THE PROBATION OFFICER:  Did you ever

3    resolve the amount of the lump sum payment?

4            THE COURT:  I have.  I don't think I have

5    announced it yet.

6            THE PROBATION OFFICER:  I just wanted to

7    make sure I didn't miss it.

8            THE COURT:  What I resolved is that I

9    don't think we should require someone who has

10   dependents living in a home to -- even if it is

11   possible to liquidate their homestead or to render

12   their dependents immediately penurious.  I don't

13   think the United States asked for that.

14           MR. PALERMO:  We do not.

15           THE COURT:  So I am content to forbear

16   any immediate lump sum payment and instruct him,

17   as we typically instruct, to pay $25 quarterly if

18   he has a Unicor job, and -- excuse me, if he has a

19   non-Unicor job, and 50 percent of his monthly

20   earnings if he has a Unicor job.

21           I think his presumptive restitution rate

22   of pay upon release should be $250 per month until

23   some demonstrable change in his ability to pay, at

24   which moment an adjustment can be made.

25           The defendant may voluntarily surrender

1    at an institution designated by the Bureau of

2    Prisons within 60 days.  He should proceed

3    immediately to the office of the United States

4    Marshal for processing and further instructions.

5           In your plea agreement, Mr. Sullivan, I

6    believe you have waived your right to appeal from

7    this judgment and sentence unless I have sentenced

8    you unlawfully, which typically meanings in excess

9    of the statutory maximum or some perhaps departing

10   upward.  I have done neither of those, so I think

11   you may have no right of appeal.  That is for you

12   and Mr. Brown to decide.

13          To the extent that an appeal is in the

14   works, there are two things that I need to tell

15   you with respect to that.  First, you have a right

16   to counsel on appeal.  If you can't afford one,

17   one would be provided for you.  As it stands now,

18   Mr. Brown would be required to preserve any

19   appellate interests that you choose to pursue

20   unless and until other counsel is substituted.

21          Secondly, any notice of appeal, that is

22   the filing that begins the appeal, must be made

23   with the clerk of this court, in writing, within

24   ten days, and accompanied by a filing fee.  If you

25   are indigent, that is broke, and you can't pay the

1   fee, then by an appropriate motion the fee can be

2   waived so that you can proceed without payment.

3          Perhaps most important for you remember

4   is that you do have a right to a lawyer -- you

5   have to appeal within ten days or you lose your

6   right to appeal.

7          Anything further, Mr. Palermo?

8          MR. PALERMO:  No, Your Honor.

9          THE COURT?  Anything further, Mr. Brown?

10         MR. BROWN:  No, Your Honor.

11         THE COURT:  Good luck to you, Mr.

12   Sullivan.  We are in adjournment.

13         (Pause.)

14         (At side bar, on the record.)

15         THE COURT:  Let's resume our hearing for

16   a moment.  I think that we are at side bar, but

17   now not under seal.  I just overlooked to seal our

18   second side bar, I think, so I now order that the

19   second side bar remain under seal pending further

20   order of the Court.

21         We are now in adjournment once again.

22   Thank you.

23         (Proceedings concluded at 10:19 a.m.)

24

25

```
1              C E R T I F I C A T E
2              I, Kerry Mercade, certify that the
3    foregoing is a correct transcript from the record
4      of proceedings in the above-entitled matter.
5                        S/Kerry Mercade
6                        _____
7                        Kerry Mercade
                         Court Reporter
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```